# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JOHN KELLY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Civ. No. 00-2498 (TFH)** |
| | ) |
| **CENTRAL INTELLIGENCE AGENCY,** | ) **FILED** |
| | ) |
| **Defendant.** | ) **AUG 0 8 2002** |

**NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT**

## MEMORANDUM OPINION

Pending before the Court are cross-motions for summary judgment by Defendant Central Intelligence Agency ("CIA" or "Agency"), and Plaintiff John Kelly, on Kelly's Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, request. Through his FOIA request, Kelly first seeks the release of all materials and records related to any and all information, including contracts, contacts, correspondence, reports, memoranda, files, etc., concerning the relationship between the CIA and the University of Cincinnati and/or the University of California/Los Angeles ("UCLA"). He also seeks the disclosure of records related to the CIA's MKULTRA program to identify subjects of CIA sponsored drug testing. Upon careful consideration of the motions, statements of material facts, replies and responses thereto, and the entire record herein, the Court will grant in part and deny in part both motions. The Court specifically will grant summary judgment for the CIA and permit its withholding of all documents at issue in Count One and all documents at issue in Count Two, except that the Court will order the CIA to search and review its operational files for information concerning the MKULTRA project and to make all releasable information available to Kelly.

## I. BACKGROUND

Plaintiff John Kelly is a published author who is working on a book concerning the subject matter of this lawsuit. Am. Compl. ¶ 3. He alleges two counts in his Complaint. Id. ¶¶ 5-10. In Count One, Kelly alleges that the CIA has failed to release relevant documents concerning his FOIA request for information that would reveal a connection between the CIA and the University of Cincinnati and/or UCLA. Id. ¶¶ 5-6. On December 8, 2000, Kelly requested by letter to the CIA "any and all information, including contracts, contacts, correspondence, reports, memoranda, files, etc. about the CIA and the University of Cincinnati and UCLA." Id. ¶ 5. On January 22, 2001, the CIA responded to Kelly by letter stating that to the extent he was seeking records that would reveal a covert relationship between the CIA and either or both of the named universities, the CIA could neither confirm nor deny the existence of such records, citing FOIA Exemptions 1 and 3, 5 U.S.C. § 552(b)(1), (b)(3). Def.'s Mot. at 3-4. On January 29, 2001, Kelly administratively appealed the denial to the CIA Agency Release Panel. Id. at 4. On May 1, 2001, the CIA responded to Kelly's appeal affirming its initial response. Id. The CIA, however, located seven documents concerning overt relationships with the two universities. Id. The CIA released one document in full and five in part and withheld one document in full on the basis of FOIA Exemptions 1, 3, and 5, 5 U.S.C. § 552(b)(1), (b)(3), and (b)(5). Id. One of the released documents concerned an overt relationship with the University of Cincinnati and the others concern overt relationships with UCLA. Id.

In Count Two of his Complaint, Kelly alleges that the CIA has failed to release relevant documents concerning his FOIA request for records concerning the CIA's MKULTRA program

to identify subjects of CIA sponsored drug testing.  Am. Compl. ¶¶ 7-10.[1]  On February 6, 1995,

Kelly sent a letter to the CIA requesting records related to the CIA's MKULTRA program to

identify subjects of CIA sponsored drug testing.  Id. ¶ 7.  Five years later, on February 16, 2000,

the CIA issued its determination letter releasing some of the requested information to Kelly and

denying release of other information on the grounds of FOIA Exemptions 1, 3, 5, and 6, 5 U.S.C.

§ 552(b)(1), (b)(3), (b)(5), and (b)(6).  Id. ¶ 8.  On March 30, 2000, Kelly administratively

appealed the denial.  Id. ¶ 9.  In response to Kelly's administrative appeal, the CIA's Agency

Release Panel released some additional information to Kelly, but denied his administrative

appeal in all other respects.  Id.  In total, the CIA released two documents in full and ninety-eight

documents with minimal redactions and withheld sixty-three documents in full.  Def.'s Mot. at 5.

---

[1] MKULTRA was a code name for a CIA project that ran from 1953 to 1966.  McNair Decl. ¶ 9.  The project involved the research and development of substances capable of employment in clandestine operations to control human behavior.  Id.  The project consisted of numerous subprojects, under which the Agency contracted out to various universities and institutions.  Id.  At least 80 institutions and 185 private researchers participated.  CIA v. Sims, 471 U.S. 159, 162 (1985).  Because the Agency funded MKULTRA indirectly, many participating researchers were unaware of the Agency affiliation.  McNair Decl. ¶ 9.  The participants in the tests were generally aware that they were being tested; however, some of the subprojects involved administering drugs such as LSD to unwitting test subjects as part of medical and psychological experiments.  Id.  Testing of the unwitting subjects usually took place in social situations involving friends and acquaintances of the researcher at safe houses where the drugs could be administered and reactions monitored.  Id.  The purpose of MKULTRA was to counter perceived Soviet and Chinese advances in brainwashing and interrogation techniques.  Sims, 471 U.S. at 162.  The project was publicly exposed in the late 1970s and became the subject of numerous government investigations.  See infra Part II.C.2.  The Department of Justice issued an opinion declaring that the government had the duty to seek out and notify persons who may have been unknowingly harmed by the drug tests.  McNair Decl. ¶ 11.  The CIA then undertook an extensive search for those test subjects.  Id.  The search had two purposes: (1) to identify and notify unwitting drug test subjects and (2) to gather as much information as possible in the likely event that litigation would result from the notification and publication of the existence of these drug tests.  Id.  The documents that were created as a result of this search are known as The Victim's Task Force records and are the records for which Kelly seeks release.  Id.

Kelly filed this lawsuit on October 18, 2000 to compel the CIA to release the withheld and redacted documents. Compl. at 1. Kelly then moved to amend his complaint on March 7, 2001 in order to cure a statute of limitations defect that would have compelled dismissal of Count One of his Complaint. Def.'s Mot. at 5-6. The Court granted Kelly's motion on March 9, 2001. Id. at 6. On April 25, 2001, the CIA moved for leave to file an amended answer in order to raise preclusion as an affirmative defense in light of the decision issued by the U.S. District Court for the District of Massachusetts in Valentine v. CIA, No. 99-30255 (summary judgment granted Sept. 1, 2000) (attached as Ex. 2 to Def.'s Mot.), concerning the CIA's processing of the very same documents that are placed at issue in Count Two of Kelly's Amended Complaint. Id. The Court granted the CIA's motion on March 19, 2002. Both parties now move for summary judgment: Kelly seeks the release of all disputed records, and the CIA seeks a finding that its withholdings were lawful.

## II. DISCUSSION

### A. Freedom of Information Act ("FOIA")

Kelly's claims arise under FOIA, 5 U.S.C. § 552. The FOIA provides a rule of general disclosure by government agencies upon request. Mandatory disclosure enables the public to gain access to government information so that it can review the government's performance of its statutory duties, thereby promoting governmental honesty. See NLRB v. Robbins Tire & Rubber Co., 437 U.S. 214, 242 (1978). Accordingly, district courts have the authority to enjoin an agency from withholding its records and to order the production of agency records where the agency improperly withheld its records. Dep't of Justice v. Tax Analysts, 492 U.S. 136, 141

4

(1989); Katz v. Nat'l Archives & Records Admin., 862 F. Supp. 476, 478 (D.D.C. 1994).

However, an agency may withhold records which fall under one of the nine enumerated

exemptions of the FOIA. See 5 U.S.C. § 552(b).

## B. Standard of Review

The Court will determine de novo the question of ordering or enjoining a government

agency's production of documents, and the agency bears the burden of justifying its withholding.

5 U.S.C. § 552(a)(4)(B); Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S.

749, 755 (1989).  Summary judgment is the usual means for disposing FOIA cases, but the Court

will grant summary judgment only if the moving party proves that no substantial and material

facts are in dispute and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c);

Founding Church of Scientology v. NSA, 610 F.2d 824, 836 (D.C. Cir. 1979).

## C. Count One: Documents Concerning the CIA's Relationship with UCLA[2]

In Count One of his Complaint, Kelly alleges that the CIA failed to release relevant

documents concerning his FOIA request for information that would reveal a connection between

the CIA and UCLA.  Am. Compl. ¶¶ 5-6.  The CIA invoked FOIA Exemptions 1 and 3 to neither

---

[2] Although Kelly originally sought records concerning relationships between the CIA and
the University of Cincinnati and/or UCLA, he does not contest the CIA's response with regard to
records concerning the University of Cincinnati in his Cross-Motion for Summary Judgment;
therefore, the Court will grant summary judgment in favor of Defendant on the records
concerning the CIA's relationship with the University of Cincinnati.  See Fed. R. Civ. P.
56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an
adverse party may not rest upon the mere allegations or denials of the adverse party's pleading,
but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth
specific facts showing that there is a genuine issue for trial.  If the adverse party does not so
respond, summary judgment, if appropriate, shall be entered against the adverse party.").

confirm nor deny the existence of any records concerning a covert relationship between the CIA and UCLA. Decl. of William H. McNair ("McNair Decl.") ¶ 47. This response is known as the "Glomar response," named from a case in which the CIA refused to confirm or deny a CIA connection to a ship named the *Hughes Glomar Explorer*, which was used to gather intelligence. Phillippi v. CIA, 546 F.2d 1009, 1011 (D.C. Cir. 1976). The CIA, however, did search for and release to Kelly forty-six pages of records that reflect an overt relationship between the CIA and UCLA. Def.'s Mot. at 14. The CIA withheld some information within these forty-six pages, citing Exemptions 1, 3, and 5 to support its withholdings. Id. Kelly challenges each of the CIA's claimed exemptions.

### 1. Exemption 1

The CIA invokes Exemption 1 of the FOIA to justify its Glomar response to Kelly's request for information concerning a covert relationship between the CIA and UCLA. McNair Decl. ¶¶ 52-53. Exemption 1 protects from disclosure national security information that has been properly classified pursuant to the relevant executive order. 5 U.S.C. § 552(b)(1). "The government has the initial burden of demonstrating that the requested material is classifiable." Public Citizen v. Dep't of State, 276 F.3d 634, 644 (D.C. Cir. 2002). Summary judgment may be granted for a government agency claiming an Exemption 1 withholding "on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and . . . they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." Id. (quoting Halperin v. CIA, 629 F.2d 144, 148 (D.C. Cir. 1980)). In addition, Congress has instructed the courts to accord "substantial weight" to agency affidavits in national security cases. Goland v. CIA, 607 F.2d 339, 352 (D.C. Cir. 1978) (quoting

S. Rep. No. 93-1200, at 12 (1974)).

In support of its Exemption 1 claim, the CIA offers the affidavit of William H. McNair, the Information Review Officer ("IRO") for the Directorate of Operations ("DO") of the CIA, who holds original classification authority at the TOP SECRET level. McNair Decl. ¶¶ 1, 3. McNair asserts that the withheld information is properly classified pursuant to Executive Order 12,958, which authorizes the classification of information that concerns "intelligence activities . . . [and] intelligence sources or methods," Exec. Order No. 12,958 § 1.5(c), 3 C.F.R. 333 (1996), reprinted in 50 U.S.C.A. § 345 note (2000). Id. ¶¶ 54-56. Executive Order 12,958 also authorizes an agency to employ a Glomar response by refusing to confirm or deny the existence or non-existence of requested information whenever the fact of its existence is itself classified. Exec. Order No. 12,958 § 3.7(a). McNair asserts that disclosing the existence or non-existence of a covert relationship with UCLA would "reveal both intelligence sources and methods" and would "result in damage to national security that [he] can identify and describe." McNair Decl. ¶¶ 56-57. McNair explains that intelligence sources are crucial to the Agency's ability to fulfill its obligations to collect intelligence to aid the nation's policymakers. Id. Such intelligence sources, McNair asserts, agree to work with the Agency only on the condition that the relationship remain confidential "to prevent numerous negative events that could occur if the clandestine relationship were exposed." Id. McNair explains that if the Agency's covert relationship with any organization were to be exposed, the organization may be subject to boycotts, economic retaliation, and adverse publicity. Id. ¶ 58. He also states that exposure of a relationship could create suspicion in other countries that all U.S. organizations are affiliated with the CIA, which could harm all entities overseas. Id. He further asserts that exposure of a

covert relationship could seriously endanger employees of the organization who travel overseas, which in the case of a university, could apply to administrators and professors, as well as past and current students. Id. ¶ 59. Furthermore, McNair claims, confirmation or denial of an Agency covert relationship with a university would damage intelligence methods because, if foreign intelligence services believe that such relationships exist, they can focus their efforts on universities and their personnel. Id. ¶ 62. Thus, for these reasons, McNair asserts that the CIA can neither confirm nor deny the existence of a covert relationship with UCLA, or any American university. Id. ¶ 63.

With regard to the three paragraphs of information redacted from one document concerning an overt relationship between the CIA and UCLA, McNair declares that the information would provide insights into how the Agency functions and how at least one segment of the Agency intends to focus its resources. Id. ¶ 65. With this information, McNair asserts, foreign intelligence services could allocate their resources to create counter-measures to combat the effectiveness of the intelligence methods employed by this division, adopt the methods for their own use, or exploit them for disinformation purposes. Id. Thus, release of the redacted information, McNair claims, would constitute a serious risk to national security. Id.

This Circuit has held that language similar to that found in McNair's declaration is specific and detailed enough to meet the CIA's burden to secure summary judgment in its favor. In Public Citizen, the government's affidavit stated:

> [The] withheld . . . information . . . relates directly to intelligence activities, sources or methods [and] [d]isclosure of this information could enable foreign persons or entities opposed to United States foreign policy objectives to identify U.S. intelligence activities, sources, or methods and to undertake countermeasures that could frustrate the ability of the U.S. Government to acquire information necessary to the formulation and

implementation of U.S. foreign policy.

The Court of Appeals found the affidavit specific and detailed enough to discharge the government's burden on a summary judgment motion. 276 F.3d at 644. Also, in Halperin, the Court of Appeals found the government's affidavit stating that if the withheld information was revealed, "representatives of hostile, foreign intelligence services working in this country [could], by a variety of techniques . . . undertake courses of action to ascertain . . . other contacts [or] other locations, and then arrive at determinations whether [the attorney] is doing any other function for the [CIA]" was sufficient to sustain the government's burden. 629 F.2d at 149. Therefore, the Court finds the CIA's affidavit in this case specific and detailed enough to satisfy its burden on its Exemption 1 claim.

Kelly, however, makes four arguments in his Cross-Motion as to why the CIA nonetheless cannot sustain an Exemption 1 claim with regard to the information he requests. Kelly's first argument is that the CIA has waived its right to invoke Exemption 1 to sustain a Glomar response or withhold documents concerning his request for information about a covert relationship between the CIA and UCLA because the CIA has already publicly disclosed information about such relationships. Pl.'s Cross-Mot. at 3. Kelly claims that while the CIA relies heavily on the Gardels case, it has not released all the information responsive to Kelly's request that it released to Nathan Gardels, who made a FOIA request for information concerning the CIA's relationships with the University of California system in the late 1970s. Id. at 1. This argument is now moot, however, because in August 2001 the CIA provided Kelly with the documents it previously released to Gardels. 08/20/01 Pl.'s Reply at 3. Kelly also contends that the CIA has previously released information related to its covert relationships with universities,

9

including UCLA, and that the CIA therefore has waived its right to withhold the requested

information on the basis of Exemption 1.  Pl.'s Cross-Mot. at 3.  For disclosure to be compelled

over an agency's otherwise valid exemption claim because the requested information is already

publicly available, three criteria must be met: (1) the information requested must be as specific as

the information previously released; (2) the information requested must match the information

previously disclosed; and (3) the information requested must have been made public through an

official and documented disclosure.  Fitzgibbon v. CIA, 911 F.2d 755, 765 (D.C. Cir. 1990).

Kelly points to a memorandum entitled "Agency-Academic Relations" written in 1968 and a

1991 memorandum from the then-Director of the CIA concerning "greater CIA openness" as

examples of the CIA's prior disclosure of the information Kelly requests.  Pl.'s Cross-Mot. at 4.

    The 1968 memo on "Agency-Academic Relations" does not meet any of the three criteria

for an official, public, prior disclosure.  First, the information requested by Kelly is much more

specific than the information contained in the memo.  The memo is a generalized discussion of

how the CIA can maintain overt and covert relationships with academic institutions.  See Ex. 2 to

Pl.'s Cross-Mot.  The memo makes suggestions and observations about Agency-Academic

relations, including discussions of how to improve the Agency's reputation in academic circles,

how to phrase requests to academia, and the need to establish "cover" arrangements for covert

contracts and prevent "blow back," a term used in intelligence for negative reaction.  See id.  But

the memo does not mention any specific universities, any specific covert relationships, any

specific programs, or any names.  See id.  Second, the information Kelly requested does not

match the information in the memo.  As stated above, the memo is a generalized discussion of

how the CIA can maintain a good reputation in the academic community in order to maintain

10

successful relationships with academic institutions.  See id.  The memo is not a discussion of the

CIA's covert or overt relationships with UCLA, which is the specific information requested by

Kelly.  Finally, even though the memo was released by the CIA to Nathan Gardels in 1976, the

memo is not an official and documented disclosure of the information requested by Kelly

because it does not contain information about the CIA's relationships with UCLA.  The CIA's

argument in this case is not that it does not have overt, or even covert, relationships with

academia, but is instead that it cannot confirm or deny its relationship with any one particular

university, lest its intelligence sources and methods be disclosed and national security threatened.

Thus, this memo, which is about how the CIA can maintain good relations with the academic

community, has nothing to do with the CIA's refusal to confirm or deny a specific relationship

with UCLA.

The 1991 memorandum entitled "Greater CIA Openness" also does not meet the test for a

prior, official, documented, public disclosure by the CIA.  Again, the information requested by

Kelly is more specific than the information contained in the memo.  The memo was

commissioned by then-CIA Director Robert Gates to "suggest proposals for making more

information about the Agency available to the American people and to give greater transparency

to [the CIA] organization."  Ex. 3 to Pl.'s Cross-Mot.  The memo acknowledges a wide range of

contacts between the CIA and academic institutions, mentions the approximately 250 speeches

CIA officers give to academic audiences each year, and mentions a mailing list of some 700

academicians who receive unclassified Agency publications four times a year.  Id.  The memo

does not mention any specific academic institutions, any specific programs, or any names.  See

id.  Thus, the memo refers very generally to CIA relations with academic institutions, while

Kelly's request is for information concerning the CIA's possible covert relationship with a specific university—namely, UCLA. In addition, UCLA is nowhere mentioned in the memo, nor does the memo even mention covert relationships; thus, it is also clear that the requested information is different from that which was disclosed in the memo. Finally, even though the CIA did officially release this memo, the memo has nothing to do with a covert relationship between the CIA and UCLA, and the CIA therefore has not made a prior, public disclosure of the information sought by Kelly with release of the memo on "Greater CIA Openness."

Thus, because the Court must be "confident that the information sought is truly public and that the requester receive no more than what is publicly available before [it] finds a waiver," Students Against Genocide v. Dep't of State, 257 F.3d 828, 836 (D.C. Cir. 2001) (quoting Cottone v. Reno, 193 F.3d 550, 555 (D.C. Cir. 1999)), the Court cannot find waiver in this case as a result of prior public disclosures because the information sought by Kelly is more specific and detailed than that which has been made publicly available.

Kelly's second argument is that the CIA has not made a proper claim of classification under Exemption 1 because many of the records he requested are more than twenty-five years old and consequently fall within the automatic declassification provision of Section 3.4 of Executive Order 12,958. Pl.'s Cross-Mot. at 7. The automatic declassification provision took effect on October 17, 2001 and applies to all classified information contained in records that are more than twenty-five years old and have been determined to have permanent historical value. Exec. Order No. 12,958 § 3.4(a). An agency head may exempt specific information from automatic declassification, including information that would reveal the identity of a confidential human source, reveal information about the application of an intelligence source or method, or reveal the

12

identity of a human intelligence source when the disclosure of that source would clearly and demonstrably damage the national security interests of the United States. Id. § 3.4(b). While McNair did not address the issue of automatic declassification in his declaration, he did show to the Court's satisfaction that either confirming or denying the existence of a covert relationship with UCLA would reveal intelligence sources and methods and threaten national security. See McNair Decl. ¶¶ 57-63.[3] Thus, the Court finds McNair's decision that this information needs to remain classified and is, therefore, exempt from the automatic declassification provision implicit in his discussion of the CIA's Exemption 1 claim. Id.[4] Moreover, the automatic declassification provision does not apply to the three paragraphs of information redacted from the document concerning an overt relationship between the CIA and UCLA on the basis of Exemption 1 because that document is dated February 3, 1984 and is thus less than twenty-five years old. See 11/06/01 Def.'s Resp. to Pl.'s Notice of Filing at 2.

Kelly's third argument is that the CIA cannot sustain a Glomar response or withhold documents concerning his request for information about a covert relationship between the CIA and UCLA because Executive Order 12,333, part 2.10 prohibits any agency in the intelligence

---

[3] The Court does not find McNair remiss for not addressing the issue of automatic declassification, as Plaintiff implies it should, see Pl.'s Reply at 9-10, because section 3.4 had yet to take effect at the time of McNair's Declaration in May 2001.

[4] McNair holds original classification authority at the TOP SECRET level and is authorized to conduct classification reviews and to make original classification and declassification decisions. McNair Decl. ¶ 3. Section 3.4 of Executive Order 12,958 requires an agency head to notify the President when the agency proposes to exempt certain information from automatic declassification, but only if the agency plans to exempt a "specific file series of records" (e.g., FBI administrative or investigatory records), not every time an agency head decides to exempt a small number of documents. Exec. Order No. 12,958 § 3.4(c); Assassination Archives & Research Ctr. v. CIA, 177 F. Supp. 2d 1, 5 n.2 (D.D.C. 2001).

community from sponsoring, contracting, or conducting research on human subjects without their informed consent. Pl.'s Cross-Mot. at 7-8 (citing Exec. Order No. 12,333, 46 Fed. Reg. 59,941 (Dec. 4 1981)). Thus, Kelly argues, because section 1.8(a) of Executive Order 12,958 forbids the classification of records in order to conceal violations of law, the CIA has not made a proper claim of classification under Exemption 1 regarding any records that relate to CIA-sponsored drug testing on non-consenting human subjects. Id. In making his argument, Kelly relies on the facts recited by the Supreme Court in Sims, 471 U.S. 159 (1985), to prove that the CIA financed the MKULTRA project, which was designed to develop methods to control human behavior through drugs and involved the drugging of unsuspecting persons without their knowledge or consent. Pl.'s Reply at 10. Thus, Kelly argues that to the extent that any of the records the CIA is withholding concerning its relationship with UCLA involve the MKULTRA project, the CIA must disclose them to Kelly. Pl.'s Reply at 11. However, the very case that Kelly relies on, Sims, forecloses his argument. In Sims, the Supreme Court specifically held that institutions and individuals who performed research for the MKULTRA project are intelligence sources and that the Director of the CIA is authorized to withhold their identities. 471 U.S. at 174. The Court will address Kelly's general request for information about the MKULTRA program below in its discussion of Count Two of Kelly's Complaint, see infra Part II.D.2-4, but insofar as Kelly requests information either proving or disproving that UCLA was involved in the project, the Supreme Court has made it clear that the CIA is under no obligation to disclose that information, see Sims, 471 U.S. at 174, 181.

Kelly's final argument is that the CIA cannot sustain an Exemption 1 claim because the information he requested should be declassified, as the public interest in disclosure outweighs the

14

CIA's need to protect the information. Pl.'s Cross-Mot. at 8. Section 3.2(b) of Executive Order 12,958 states that when an issue of public interest arises, an agency head or senior agency official shall determine whether the need to protect some information is outweighed by the public interest in disclosure. To demonstrate the high public interest in the MKULTRA program, Kelly cites the numerous investigations of the program by the Executive Branch, Congress, and independent commissions and the fact that MKULTRA has been front-page news. Pl.'s Reply at 11. However, Kelly seems to be confusing the records at issue in Count One of his Complaint with the records at issue in Count Two of his Complaint, which concern the CIA's MKULTRA program. There may be a high public interest in the MKULTRA program, but Kelly's request is for records concerning the CIA's relationship with UCLA, of which there is no such documented public interest. Moreover, the Supreme Court has held that institutions that participated in MKULTRA are protected and need not be disclosed, notwithstanding the public interest in the program itself. Sims, 471 U.S. at 181. In addition, Executive Order 12,958 is explicit that the decision whether to declassify information based on public interest is made by the agency head or senior agency official, not by the courts. Exec. Order No. 12,958 § 3.2(b). The Executive Order also states that this section of the Order is not subject to judicial review. Id. § 3.2(b)(2). In this case, a senior agency official has made the determination that confirming or denying the existence of a covert relationship between the CIA and UCLA or releasing some information about the overt relationship between the CIA and UCLA would be contrary to the public interest because it would threaten our national security, see McNair Decl. ¶¶ 63, 65, and, as the Executive Order makes clear, the Court does not have the authority to review this determination, see Exec. Order No. 12,958 § 3.2(b).

15

**2. Exemption 3**

The CIA also claims that Exemption 3 independently supports its Glomar response to Kelly's FOIA request. Def.'s Mot. at 12. Exemption 3 protects information that is "specifically exempted from disclosure by statute." 5 U.S.C § 552(b)(3). A two-part inquiry determines whether Exemption 3 applies to a given case. Sims, 471 U.S. at 167. The first question is whether the relied upon statute is within the scope of Exemption 3. Id. The second question is whether the requested information falls within the scope of the statute. Id. The statute the CIA relies on is section 403-3(c)(7) of the National Security Act, which provides that the Director of Central Intelligence shall "protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 403-3(c)(7); Students Against Genocide, 257 F.3d at 833. It is well-settled that section 403-3(c)(7) qualifies as a withholding statute under Exemption 3. Sims, 471 U.S. at 168; Gardels v. CIA, 689 F.2d 1100, 1103 (D.C. Cir. 1982). To show that section 403-3(c)(7) applies to the case at bar, the CIA must demonstrate that an answer to Kelly's query "can reasonably be expected to lead to unauthorized disclosure of intelligence sources and methods." Gardels, 689 F.2d at 1103 (quoting Halperin, 629 F.2d at 147). As detailed above, the CIA's affidavit explains that if the CIA were to deny or confirm the existence of a covert relationship with UCLA, its intelligence sources and methods would be exposed and national security would be threatened. Indeed, the CIA's Exemption 3 claim supporting its Glomar response is clearly supported by precedent in this Circuit because the Court of Appeals has upheld the CIA's refusal to confirm or deny the existence of records pertaining to covert contacts between the CIA and the eleven campuses of the University of California. Id. at 1102. In Gardels, the Court of Appeals explained that if the CIA admitted a covert relationship with the University of California, foreign

intelligence services would be able to "zero in and identify specifically what were the nature of those relationships or with whom the relationships were." Id. at 1104. The Court of Appeals continued its reasoning by stating that "if the Agency were required to indicate those schools with which it had had no covert contact, the work of foreign intelligence bodies would obviously be much easier; they could and would concentrate their efforts on the remaining American colleges and universities, and their sphere of activity could be appreciably narrowed." Id. Moreover, the Court of Appeals held that to "reveal or acknowledge covert contacts with the University might very well disclose some sources or methods of foreign intelligence (or both) and that the Agency's judgment must be accepted." Id. at 1105. Therefore, the Court finds that the CIA was justified in refusing to confirm or deny the existence of a covert relationship with UCLA on the basis of Exemption 3.

The CIA further invokes Exemption 3 to support its withholding of information in regard to an overt relationship between the CIA and UCLA. Def.'s Mot. at 16. The CIA relies on 50 U.S.C. § 403g (codified as part of the Central Intelligence Agency Act of 1949, 50 U.S.C. § 403), to support these withholdings. Id. Section 403g provides that "the Agency shall be exempted from the provisions of any law which requires the publication or disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency." 50 U.S.C. § 403g. This Circuit has held that 50 U.S.C § 403g is a statute within the scope of Exemption 3. Goland, 607 F.2d at 350. The CIA asserts that it has withheld information that would identify its own employees, including their signatures; Agency organizational information; information that would identify the precise nature of the CIA's overt relationship with UCLA; and information that would reveal protected budgetary details. Def.'s Mot. at 16. The CIA

asserts that, as a practice, it does not disclose the names of its employees because doing so could

compromise present and past intelligence operations and endanger the lives of those employees

or their descendants. McNair Decl. ¶ 36. It is also common practice, according to the CIA, for

the CIA to refuse to release employees' signatures in order to reduce the likelihood of forged

checks, credit card applications, and Agency documents. Id. ¶ 37. The CIA also claims that it

has withheld information about the internal organization of the CIA to prevent detailed

knowledge of Agency personnel, structure, and organization from becoming available for use as

a tool for hostile manipulation. Id. ¶ 38. This Circuit has upheld the CIA's refusal to disclose

names and initials of CIA personnel, information about specific intelligence operations, and the

functions and organization of the Agency. See Military Audit Project v. Casey, 656 F.2d 724,

749 (D.C. Cir. 1981) (holding that "documents that might disclose the names, initials,

pseudonyms, and official titles of CIA personnel . . . are properly withheld by the government");

see also Goland, 607 F.2d at 351 (holding that the government properly withheld information

about the functions and organization of the CIA on the basis of Exemption 3). This Circuit has

also upheld the CIA's ability to withhold information about its budget. Military Audit Project,

656 F.2d at 749 (stating that, "The annual CIA budget . . . is not now and never has been a matter

of public knowledge. The nondisclosure of this information has a long record of approval by the

Congress."). Thus, the Court finds the CIA's withholding of information about the identify of its

employees, its internal organization, and its budget justified.

Kelly argues that the CIA cannot refuse to search its operational files on the basis of

Exemption 3, however, because the MKULTRA program has been the subject of numerous

government investigations. Pl.'s Cross-Mot. at 6. The operational files of the CIA are exempt

18

from disclosure in all but three specific circumstances: (1) when a FOIA request is made by a United States citizen or legal alien for information on herself; (2) when a FOIA request concerns a "special activity," the existence of which is not exempt from disclosure under FOIA; and (3) when a FOIA request concerns the specific subject matter of an investigation by the intelligence committees of the Congress, the Intelligence Oversight Board, the Department of Justice, the office of the General Counsel of the CIA, the Office of the Inspector General of the CIA, or the Office of the Director of Intelligence of the CIA for any impropriety or violation of law. 50 U.S.C. § 431(a)-(c). The MKULTRA program has been the subject of numerous investigations: by the CIA's Office of Inspector General in 1963; by the 1975 Commission on CIA Activities Within the United States (the Rockefeller Commission); by the 1975 Senate Select Committee to Study Governmental Operations with respect to Intelligence Activities (the Church Committee); and by the Senate Select Committee on Intelligence and the Subcommittee on Health and Scientific Research in their joint hearings in 1977. McNair Decl. ¶ 11. However, these investigations are not relevant to the records at issue in Count One of Kelly's complaint, which concern records reflecting a relationship between the CIA and UCLA, not records concerning the MKULTRA program.[5] There have been no government investigations into the relationship between the CIA and UCLA. Thus, the CIA's operational files with respect to the records at issue in Count One of Kelly's Complaint are exempted from FOIA by 50 U.S.C. § 431(a) and do not have to be searched in response to Kelly's request.

---

[5] Even if UCLA was somehow involved in the MKULTRA program and the CIA's operational files reflect this involvement, the CIA still does not have to disclose those files because the Supreme Court specifically has ruled that the CIA may withhold the names of researchers and institutions who participated in MKULTRA as protected intelligence sources. Sims, 471 U.S. at 174, 181.

Kelly also argues, just as he did for the CIA's Exemption 1 claim, that the CIA waived its right to invoke Exemption 3 to sustain a Glomar response or withhold documents concerning his request for information about a covert relationship between the CIA and UCLA because the CIA has already publicly disclosed information about such relationships. Pl.'s Cross-Mot. at 3. However, for the same reasons the Court cited in regard to Kelly's claim of waiver on the basis of Exemption 1, see supra Part II.C.1, the Court cannot find waiver in this case as a result of prior public disclosures because the information sought by Kelly is more specific and detailed than that which has been made publicly available. See Students Against Genocide, 257 F.3d at 836 (holding that a court must be "confident that the information sought is truly public and that the requester receive no more than what is publicly available before [it] finds a waiver").

### 3. Exemption 5

The CIA withheld one document in full concerning an overt relationship between the CIA and UCLA on the basis of FOIA Exemption 5. Def.'s Mot. at 17-18. Exemption 5 protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). The purpose of Exemption 5 is "to protect the quality of agency decision-making by preventing the disclosure requirement of the FOIA from cutting off the flow of information to agency decision-makers," Mead Data Cent., Inc. v. Dep't of the Air Force, 566 F.2d 242, 252 (D.C. Cir. 1977), and its coverage is broad, incorporating all civil discovery rules into FOIA, Martin v. Office of Special Counsel, 819 F.2d 1181, 1185 (D.C. Cir. 1987). The CIA claims attorney-client and deliberative process privileges for its withholding of the document. Def.'s Mot. at 18. This Circuit has held that Exemption 5 encompasses the attorney-client privilege, which assures a client that

confidential communications to her attorney will not be disclosed. Mead Data Cent., 566 F.2d at 252. The deliberative process privilege, which protects the decision-making processes of government agencies, is also a recognized privilege under Exemption 5. Mapother v. Dep't of Justice, 3 F.3d 1533, 1537 (D.C. Cir. 1993). Two requirements must be met for the deliberative process privilege to be invoked. Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980). First, the communication must be "predecisional," or generated before the adoption of an agency policy. Id. Second, the communication must be "deliberative," or reflective of the "give-and-take" of the consultative process. Id.

The Vaughn Index submitted by the CIA describes the withheld document as a memorandum from the General Counsel ("GC") of the CIA to the Deputy Director for Planning and Coordination regarding the ability to provide a grant to UCLA for an academic program. Ex. B to Def.'s Mot.[6] The CIA asserts that the entire document concerns legal advice from the GC to a Deputy Director of the Agency regarding the use of Agency funds and that the entire document contains candid, pre-decisional comments on the potential availability of Agency funding for a potential future use. Id. The CIA also asserts that no meaningful segregable information could be released. Id.

The CIA's description adequately demonstrates that the information in the letter was communicated by an attorney in order to provide the Deputy Director with advice on the use of

_____

[6] The Court of Appeals for this Circuit held in Vaughn v. Rosen, 484 F.2d 820, 826-27 (D.C. Cir. 1973), that courts could not accept conclusory and generalized allegations of FOIA exemptions from government agencies, but would require government agencies to submit in FOIA proceedings an itemized index of documents that correlates its justifications for refusal to disclose with actual portions of the documents claimed to be exempt. Such indices thus have become known as Vaughn Indices.

Agency funds, and because the Agency's budget is not a matter of public record, see Military Audit Project, 656 F.2d at 749 (stating that "[t]he annual CIA budget . . . is not now and never has been a matter of public knowledge"), the information is confidential. Mead Data, 566 F.2d at 253 (holding that the attorney-client privilege applies when the agency demonstrates that the documents in question were communicated to or by an attorney as part of a professional relationship in order to provide legal advice on confidential matters). The CIA has also adequately demonstrated that the letter contains the GC's personal suggestions and recommendations on a matter prior to a final decision. See Coastal States, 617 F.2d at 866 (holding that the deliberative process exemption covers "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency"). Therefore, the Court finds the CIA's withholding of the document in full justified on the basis of the attorney-client and deliberative process privileges encompassed by Exemption 5.

Kelly argues, however, that the CIA cannot withhold information on the basis of Exemption 5 because the CIA has failed to release reasonably segregable portions of withheld records as required by FOIA. Pl.'s Cross-Mot. at 8-9. Kelly rests this claim on his assertion that the CIA's prior public disclosure of information about its covert relationships with universities demonstrates that reasonably segregable factual information has not been released to him. Id. at 9 (citing EPA v. Mink, 410 U.S. 73, 89 (1973) (holding that deliberative or policy-making processes are exempt under the deliberative process privilege but that factual, investigative material is not exempt)). The Court has determined, however, that there has not been a prior public disclosure of the information Kelly requests, see supra Part II.C.1, and Kelly has not

offered any evidence to contradict the CIA's assertion that the document withheld in full on the

basis of the Exemption 5 deliberative process privilege contains candid, pre-decisional comments

on the potential availability of Agency funding for a particular use and that no meaningful

portions are segregable. See Vaughn Index (attached as Ex. B to Def.'s Mot.). Therefore,

because the Court finds the CIA's affidavits detailed enough to establish that the withheld

document falls within Exemption 5's deliberative process privilege and because Kelly has not

supported his claim with evidence in the record, the Court upholds the CIA's Exemption 5 claim.

See Mink, 410 U.S. at 839 (holding that if a court finds that an agency's affidavits are detailed

enough to establish that the requested document falls within Exemption 5's deliberative process

privilege, the court may rely on the affidavits and find the agency's withholding justified); see

also Military Audit Project, 656 F.2d at 745 (upholding the government's Exemption 5 claim

because "the key premise on which the appellants base their argument . . . is unsupported by the

record and contrary to the government's affidavits, [which] are entitled to substantial weight.").

For the reasons stated above, the Court finds the CIA's refusal to confirm or deny the

existence of a covert relationship between the CIA and UCLA and its withholding of certain

information with regard to an overt relationship between the two on the basis of FOIA

Exemptions 1, 3, and 5 justified. Therefore, the Court will grant summary judgment in favor of

the CIA on Count One.

**D. Count Two: Documents Concerning the MKULTRA Victim's Task Force**

In Count Two, Kelly alleges that the CIA failed to release relevant documents concerning

his FOIA request for information about the CIA's 1978 investigation into the MKULTRA

program in order to identify subjects of Agency-sponsored drug testing. Am. Compl. ¶¶ 7-9.

This investigation is commonly known as "The Victim's Task Force" and involved an "Agency effort to identify, find, and notify persons who could still be suffering adverse effects from drugs administered to them without their knowledge as part of the CIA's MKULTRA project."  McNair Decl. ¶ 8.  The CIA argues that the Court need not reach the merits of Kelly's claim in Count Two because Kelly is precluded from litigating this claim by the decision of the U.S. District Court for the District of Massachusetts in Valentine v. CIA, No. 99-30255 (attached as Attach. B to Def.'s Mot.).  Def.'s Mot. at 19-20.  In the alternative, the CIA argues that its withholdings with respect to Kelly's request are justified by FOIA Exemptions 3, 5, and 6.  Id. at 29-30.

### 1. Preclusion

The CIA argues that principles of res judicata preclude Kelly from litigating his second claim because the U.S. District Court for the District of Massachusetts already ruled on the records at issue in this case in Valentine v. CIA, No. 99-30255.  Def.'s Mot. at 19-20.  In Valentine, Douglas Valentine, an author, sued the CIA under FOIA to compel release of documents relating to the CIA Victims Task Force, the same records that are at issue in this case.  Def.'s Mot. at 22.  The CIA moved for summary judgment in July 2000, and Valentine, a *pro se* non-lawyer plaintiff, did not oppose the CIA's motion.  Pl.'s Cross-Mot. at 10.  The district court granted summary judgment in the government's favor in September 2000.  Id.

Under res judicata, or claim preclusion, a final judgment on the merits bars further claims by parties or their privies based on the same cause of action.  Montana v. United States, 440 U.S. 147, 153 (1979).  There was a final judgment on the merits in Valentine.  See In re Gottheiner, 703 F.2d 1136, 1140 (holding that a case decided on an unopposed motion for summary judgment was a final judgment on the merits; "that . . . [plaintiff] decided his case was no longer

worth the effort does not alter the fact that he had his day in court"); see also Dicken v. Ashcroft, 972 F.2d 231, 233 n.5 (8th Cir. 1991) (stating that "it is well established that summary judgment is a final judgment on the merits for purposes of res judicata"). The Valentine case and the case at bar are also based on the same cause of action. Douglas Valentine brought his suit pursuant to the FOIA to enjoin the CIA from withholding agency records concerning his request for information on the CIA's Victim's Task Force. Valentine Am. Compl. ¶¶ 4-6 (attached as Ex. B to Def.'s Mot.). Kelly has also brought this suit pursuant to the FOIA to enjoin the CIA from withholding agency records concerning his request for information on the CIA's Victim's Task Force. Kelly Am. Compl. ¶¶ 7-10.

The requirement under res judicata that the parties either be the same or in privity, however, is not met in this case. Privity "designates a person so identified in interest with a party to a former litigation that he represents precisely the same legal right in respect to the subject matter involved." Gill & Duffus Serv., Inc. v. A.M. Nural Islam, 675 F.2d 404, 406 n.3 (D.C. Cir. 1982). This Circuit has defined the test for privity as "whether a party participated in control of an action, individually or in cooperation with others, to establish and protect some proprietary or financial interest of his own." Id. at 406 n.5. The Supreme Court has listed the following factors, among others, as supporting a finding that a non-party assumed control over previous litigation: the non-party (1) required the lawsuit to be filed; (2) reviewed and approved the complaint; and (3) paid the attorneys' fees and costs. Montana, 440 U.S. at 155. The CIA has produced no evidence that Kelly assumed control of the litigation by Valentine in any of the above-mentioned ways, and the only documented relationship between Kelly and Valentine is that they were "associates." Valentine Am. Compl. ¶ 10. At the time each made his respective

25

FOIA request, both were working on separate books about the MKULTRA project. Id. ¶ 5-6; Kelly Am. Compl. ¶ 3. Valentine claimed in his complaint that after waiting six years for the CIA to release the records he requested, that he "allowed" Kelly to submit his own FOIA request for the same records with the hope that the CIA would respond more quickly to Kelly because Kelly is a journalist. Valentine Am. Compl. ¶ 10. This Circuit, however, has held that a mere association between two people does not establish privity. See Gill & Duffus, 675 F.2d at 407. Thus, because Kelly's interests were inadequately represented by Valentine and Kelly has not yet had his day in court, the Court concludes that he is not precluded from litigating his claim because of the decision in Valentine.

### 2. Exemption 3

The CIA alternatively argues that Exemptions 3, 5, and 6 justify its withholding of certain information from the Victims Task Force records. Def.'s Mot. at 29. As mentioned above, see supra Part II.C.2, Exemption 3 protects information that is "specifically exempted from disclosure by statute." 5 U.S.C § 552(b)(3). The CIA invokes Exemption 3 to withhold the names of MKULTRA researchers and the institutions for which they worked, relying on section 403-3(c)(7) of the National Security Act, which provides that the Director of Central Intelligence shall "protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C § 403-3(c)(7); see Students Against Genocide, 257 F.3d at 833; McNair Decl. ¶¶ 19-20, 26. The CIA's ability to withhold this information on the basis of Exemption 3 was upheld by the Supreme Court in CIA v. Sims, 471 U.S. 159 (1985). In Sims, an attorney and the director of the Public Citizen Health Research Group filed a FOIA request with the CIA seeking the names of individuals and institutions that performed research for MKULTRA. Id. at 163. Citing

Exemption 3, the CIA declined to disclose the names of all individual researchers and twenty-one institutions. Id. The CIA argued, and the Supreme Court agreed, that the names of individuals and institutions involved in MKULTRA are "intelligence sources" and that to disclose these confidential associations would jeopardize the Agency's intelligence gathering capabilities in the future because other possible sources would be reluctant to aid the CIA out of fear that their Agency connection would also be disclosed. Id. at 175 ("This forced disclosure of the identities of its intelligence sources could well have a devastating impact on the Agency's ability to carry out its mission.").

The CIA also invokes Exemption 3 to withhold from the MKULTRA documents the identities of Agency employees, or, in some cases, their signatures; CIA organizational information; and internal filing data that would shed light on the Agency's internal organizational structure. Def.'s Mot. at 31-32. The CIA relies on 50 U.S.C. § 403g, codified as part of the Central Intelligence Agency Act of 1949, 50 U.S.C. § 403, to support these withholdings. Id. at 32. Section 403g provides that "the Agency shall be exempted from the provisions of any law which requires the publication or disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency." 50 U.S.C. § 403g. This Circuit has held that 50 U.S.C. § 403g is a statute within the scope of Exemption 3. Goland, 607 F.2d at 350.

The CIA asserts that, as a practice, it does not disclose the names of its employees because doing so could compromise present and past intelligence operations and endanger the lives of those employees or their descendants. McNair Decl. ¶ 36. The CIA also explains that it is common practice to refuse to release employees' signatures to reduce the likelihood of forged

27

checks, credit card applications, and Agency documents. Id. ¶ 37. In addition, the CIA states

that it withholds information about the internal organization of the CIA to prevent detailed

knowledge of Agency personnel, structure, and organization from becoming available for use as

a tool for hostile manipulation. Id. ¶ 38. This Circuit has upheld the CIA's refusal to disclose

names and initials of CIA personnel, information about specific intelligence operations, and the

functions and organization of the Agency. See Military Audit Project, 656 F.2d at 749; see also

Goland, 607 F.2d at 350. The Court therefore finds the CIA's withholding of information about

the identify of its employees and its internal organization justified.

        As in his defense of Count One, however, Kelly makes four arguments in his Cross-

Motion as to why the CIA nonetheless cannot sustain an Exemption 3 claim with regard to the

information he requests. First, Kelly argues that the CIA's Exemption 3 claim fails because the

CIA Director allowed MKULTRA-participating institutions to decide for themselves if they

wanted to publicly admit their involvement in the project. Pl.'s Cross-Mot. at 19. Kelly cites

CIA Director Stansfield Turner's testimony before a U.S. Senate committee hearing in 1977 for

this assertion. Id. Kelly claims that if universities were free to announce their involvement in

MKULTRA, then obviously no national security interests were threatened by the disclosure. Id.

at 20. Kelly also claims that this issue was not addressed by the Supreme Court in Sims, so it is

not foreclosed by that opinion. The Court, however, finds Kelly's reading of Sims unpersuasive.

The Supreme Court there specifically acknowledged that the CIA contacted each institution

involved in MKULTRA to ask permission to disclose its identity and that fifty-nine of the

approximately eighty institutions consented. 471 U.S. at 164 n.7. Yet it made it clear that the

CIA may withhold the names of the individual researchers involved in MKULTRA and their

institutional affiliations on the basis of Exemption 3. Id. at 181. The Court therefore did not find

that the fact that the names of some participating institutions had been disclosed meant that the

CIA was forced to disclose the names of all the institutions or the names of any of the individual

researchers.

Second, Kelly contends that the CIA cannot sustain an Exemption 3 claim to withhold

information from the MKULTRA documents because many of the records he requests are more

than twenty-five years old, and Executive Order 12,958 requires automatic declassification of all

classified information that is more than twenty-five years old and has been determined to have

permanent historical value. Pl.'s Cross-Mot. at 22 (citing Exec. Order No. 12,958 § 3.4(a)). The

Court finds this argument misplaced, however, because section 3.4 of Executive Order 12,958 is

not relevant to an Exemption 3 claim, which concerns information specifically exempted by

statute, not classified information.[7]

Third, Kelly claims that the CIA cannot sustain an Exemption 3 claim to withhold

information from the MKULTRA documents because Exemption 3 allows only the Director of

the CIA to protect intelligence sources and methods and that, consequently, William McNair, the

Information Review Officer who submitted the government's affidavit in this case, did not have

the authority to assert the Exemption 3 claim. Pl.'s Reply at 20. Kelly believes that the only

proper way to assert an Exemption 3 claim is by an affidavit from the Director of the CIA

himself, citing Sims, 471 U.S. at 167, and Fitzgibbon, 911 F.2d at 762. Id. Kelly's claim,

---

[7] Section 3.4 of Executive Order 12,958 would be relevant to an Exemption 1 claim, which protects from disclosure national security information that has been properly classified pursuant to the relevant executive order, but the CIA does not make an Exemption 1 claim with regard to Count Two of Kelly's Complaint.

however, is without merit. While the Director of the CIA did submit an affidavit in <u>Sims</u>, 471

U.S. at 173 n.18, the Court in <u>Sims</u> did not hold that the Director must do so in every instance.

Moreover, the court in <u>Fitzgibbon</u> did not even mention whether the Director was involved in the

case, much less state that it was necessary for the Director to submit an affidavit. <u>See</u> 911 F.2d at

761-64. Finally, multiple prior decisions in this Circuit prove that the Director of the CIA need

not personally submit an affidavit in order for the CIA to properly assert an Exemption 3 claim.

<u>See, e.g.</u>, <u>Gardels</u>, 689 F.2d at 1104-05 (affirming the CIA's Exemption 3 claim on the basis of an

affidavit of the Deputy Director for Administration of the CIA and Chairman of the Information

Review Committee); <u>Goland</u>, 607 F.2d at 351 (affirming the CIA's Exemption 3 claim on the

basis of an affidavit by CIA Legislative Counsel).

Fourth, Kelly claims that the Court must order the release of CIA operational files

responsive to his request because the MKULTRA program has been the subject of numerous

government investigations. Pl.'s Cross-Mot. at 23. As explained above, <u>see</u> <u>supra</u> pp. 18–19, the

operational files of the CIA are exempt from disclosure in all but three specific circumstances,

one of which is when a FOIA request concerns the specific subject matter of an investigation by

the intelligence committees of the Congress, the Intelligence Oversight Board, the Department of

Justice, the office of the General Counsel of the CIA, the Office of the Inspector General of the

CIA, or the Office of the Director of Intelligence of the CIA for any impropriety or violation of

law. 50 U.S.C. §§ 431(a)-(c). The MKULTRA program has been the subject of numerous

investigations. <u>See</u> <u>supra</u> pp. 18–19. Therefore, the Court finds that 50 U.S.C. § 431(c) requires

the CIA to search and review its operational files for information concerning the MKULTRA

project and will accordingly order the CIA to conduct such a search and review, making all

releasable information available to Kelly.

Thus, the Court affirms the CIA's withholding of the names of MKULTRA researchers and the institutions for which they worked, the identities of Agency employees, CIA organizational information, and internal filing data that would shed light on the Agency's internal organizational structure, but finds that the CIA must search and review all CIA operational files for information concerning MKULTRA and make all releasable information available to Kelly.

### 3. Exemption 5

In response to Kelly's request for the Victims Task Force Records, the CIA released 100 documents that shed light on the Agency's efforts to identify and locate the unwitting subjects of MKULTRA drug testing. Def.'s Mot. at 34. The documents that have been released provide information on the nature of the drug testing and on some of the researchers who were associated with various subprojects. Id. The CIA, however, withheld four documents in part and sixty-three documents in full on the basis of FOIA Exemption 5. Id. at 33. Exemption 5 allows an agency to protect information from FOIA disclosure that would be privileged if the agency were in litigation with an opposing party. 5 U.S.C. § 552(b)(5). Thus, the attorney work-product privilege, the attorney-client privilege, and the deliberative process privileges which are recognized under civil discovery rules have all been recognized under Exemption 5. See Coastal States, 617 F.2d at 862, 864, 866.

As previously mentioned, when the MKULTRA project came to light in 1977, the Department of Justice informed the CIA that it had a legal obligation to find and notify persons who were the unwitting subjects of drug testing. McNair Decl. ¶ 40. To implement this legal obligation, the Director of Central Intelligence sought advice from his legal counsel on the exact

nature and extent of the Agency's obligation to the test subjects, the parameters of any legal liability, and the most productive way to identify and locate the test subjects. Def.'s Mot. at 33-34. The CIA claims that the withheld information reflects these preliminary, internal discussions about the Victims Task Force and the best way to defend itself in prospective litigation arising from MKULTRA drug tests and is, therefore, exempted from disclosure based on the attorney work-product privilege, the attorney-client privilege, or the deliberative process privilege. Id. at 34.

First, the CIA claims that the attorney work-product privilege justifies its withholding of thirty-six documents. Def.'s Mot. at 34; Def.'s Ex. D. The purpose of the work-product privilege is to protect the adversarial trial process by insulating an attorney's preparations from scrutiny. Jordan v. Dep't of Justice, 591 F.2d 753, 775 (D.C. Cir. 1978) (en banc). The work-product privilege does not attach until some articulable claim likely to lead to litigation has arisen, but once it does, the privilege sweeps broadly and protects both factual information as well as opinions and analysis. Coastal States, 617 F.2d at 865. The CIA claims that once it knew it had a legal obligation to notify unwitting subjects of MKULTRA drug testing, it recognized that it faced the prospect of litigation from individuals who would claim that they had been harmed by the drug tests, and that, therefore, the General Counsel for the CIA directed his staff to prepare for eventual litigation. McNair Decl. ¶¶ 40-41.[8] The CIA claims that the withheld information reflects these attorneys' thought-processes on how to conduct potential litigation, their assessment of incidents, and their overall strategy for a possible lawsuit. Id. ¶ 41.

---

[8] The Agency has been sued several times by individuals claiming to be associated with MKULTRA. See Kronisch v. United States, 150 F.3d 112 (2d Cir. 1998); Orlikow v. United States, 682 F. Supp. 77 (D.D.C. 1988). One such suit is still pending. McNair Decl. ¶ 40.

The CIA's <u>Vaughn</u> Index describes the thirty-six documents for which the CIA invokes

the work-product privilege as: (1) a memorandum from the Deputy Directory for Administration

("DDA") to the Director of Central Intelligence ("DCI") describing advice that the Agency's

General Counsel ("GC") provided the DDA regarding the Agency's approach to locating

MKULTRA test subjects; (2) a memo from the DDA to various individuals within the Agency

describing advice that the GC provided the DDA regarding the Agency's approach to locating

MKULTRA test subjects; (3) a memo from the DDA to the DCI describing advice that the Office

of the General Counsel ("OGC") gave the DCI regarding the scope of the task force

investigation; (4) a memorandum from the DCI summarizing his telephone conversation with the

Attorney General ("AG") and the GC, which discussed possible courses of action to be taken by

the Department of Justice ("DOJ") for MKULTRA notification; (5) a memo from the Agency's

OGC to an Agency employee regarding the status of DOJ's efforts in examining MKULTRA for

the notification of individuals; (6) a memo from an Associate General Counsel ("AGC") to the

DCI concerning the status of the MKULTRA notification program; (7) a memo from the GC to

the DCI requesting approval of a letter to the AG that summarizes the issues connected to the

notification of individuals; (8) a memo from the GC regarding a meeting with DOJ regarding the

MKULTRA program; (9) a memo from an Agency attorney to an Agency employee concerning

research done on the Agency's authority to be involved in notifying individuals or compensating

the subjects of MKULTRA; (10) a Memorandum for the Record ("MFR") from the AGC

concerning the constitutional and statutory bases for a program to search out MKULTRA

individuals; (11) a note for the GC from an Agency employee concerning the DOJ's opinion on

the Agency's responsibilities and authorities to locate individuals; (12) an internal routing and

33

record sheet, including notes by an Agency, attorney and a three-page MFR by an Agency

attorney describing the outcome of a meeting with a non-Agency employee on the government's

obligation to locate and notify individuals; (13) a memo to the Office of Inspector General from

an AGC concerning an individual's claim of having been a subject of MKULTRA activities;

(14) a memo to the DCI from the GC making a recommendation as to letters to two Senators on

the status of the program to identify MKULTRA subjects; (15) a memo from the AGC to an

Agency employee concerning how to proceed with the notification of individuals involved in the

testing; (16) a one-page letter to the Judge Advocate General ("JAG") from the AGC concerning

the DOJ's opinion on the government's responsibility to attempt to identify and notify

MKULTRA test subjects; (17) a one-page letter to the DOJ's Office of Legal Counsel from the

AGC concerning the DOJ's opinion on the government's responsibility to attempt to identify and

notify MKULTRA test subjects; (18) a memo for the DCI from the GC concerning the DOJ's

opinion on the government's responsibility to attempt to identify and notify MKULTRA test

subjects and suggestions for implementing such a program; (19) a memo from the OGC to an

Agency employee stating further action is required to identify subjects on various MKULTRA

subprojects; (20) a memo from the AGC to two Agency employees concerning the prioritized

listing of MKULTRA subprojects; (21) a draft letter from the Deputy GC to a researcher and

discusses the invitation to comment on an individual's testimony before the Senate Select

Committee on Intelligence; (22) a memo from the Special Assistant to the DDA to the GC

discussing a coordinated position to be presented to the DCI on MKULTRA drug testing; (23) a

two-page MFR by an Agency attorney regarding the attorney's conversation with a MKULTRA

researcher's son; (24) a three-page MFR by an Agency attorney discussing the attorney's

34

conversation with a MKULTRA researcher; (25) a two-page MFR by an Agency attorney

discussing the attorney's summary of research conducted by a particular MKULTRA researcher;

(26) a memo from the GC to an Agency employee discussing the non-concurrence of the GC to

another memo suggesting that no further action be taken on a subproject; (27) a memo to the

Special Assistant to the DDA from the AGC concerning the reconsideration of subprojects of

MKULTRA; (28) a memo from the GC to an Agency employee stating the GC's non-concurrence

in the determination that no further action was required in connection to a specific subproject;

(29) a four-page MFR by an Agency employee, with concurrence by the GC, discussing

MKULTRA subprojects, institutions, and requests for assistance/testimony from an individual

working at the facility; (30) a letter to the GC from the Special Assistant to the DDA forwarding

guidelines for the identification of activities which should be reviewed to determine the

notification process; (31) a memo to the DDA from the Special Assistant to the DDA reviewing

the proposed standards for the program of notification; (32) a memo from the AGC to an Agency

employee discussing a draft letter requesting assistance from a MKULTRA researcher; (33) a

memo from the Special Assistant to the DDA to the GC discussing the redrafts of letters to

private individuals regarding assistance in the notification program; (34) a memo from the AGC

to an Agency employee discussing the OGC opinion regarding a certain subproject; (35) a memo

from the AGC to the Special Assistant to the DDA regarding the reconsideration of the AGC's

position on certain subprojects; and (36) a memo to DDA from a Special Assistant concerning

questions that need to be answered regarding a program for notification of drug testing. Ex. D to

Def.'s Mot.

      The Court finds the <u>Vaughn</u> Index descriptions adequate to show that the withheld

information was prepared in anticipation of litigation and therefore falls within Exemption 5.

See Delaney, Migdail & Young v. IRS, 826 F.2d 124, 127 (D.C. Cir. 1987) (holding that the IRS

properly withheld documents on the basis of the work-product privilege that contained advice to

the agency on the types of legal challenges likely to be mounted against a proposed program,

potential defenses available to the agency, and the likely outcome).

Second, the CIA claims that the attorney-client privilege justifies its withholding of forty-

five documents.  Def.'s Mot. at 36.[9]  The attorney-client privilege assures a client that her

confidences to her attorney will be protected.  Coastal States, 617 F.2d at 862.  "The privilege is

not limited to communications made in the context of litigation . . . but extends to all situations

in which an attorney's counsel is sought on a legal matter."  Id.  The CIA asserts that the Agency's

Office of General Counsel, and especially the GC himself, engaged in extensive, confidential

communications with decision-makers within the Agency on how to implement the DOJ's

opinion that the Agency had a responsibility to MKULTRA test subjects, as well as how certain

actions undertaken by the Agency could become issues at a possible trial.  McNair Decl. ¶ 42.

The CIA claims that the fact that MKULTRA had already been made public at the time of these

discussions did not impact the confidential manner in which they were conducted.  Id.

The Vaughn Index describes the forty-five documents for which the CIA invokes the

attorney-client privilege as: (1) a memo from the DDA to the DCI describing advice that the

Agency's GC provided the DDA regarding the Agency's approach to locating MKULTRA test

subjects; (2) a memo from the DDA to various individuals within the Agency describing advice

---

[9] The CIA invokes both the attorney-client privilege and the attorney work-product privilege for many of the same documents.  See Vaughn Index (Ex. D to Def.'s Mot).

that the GC provided the DDA regarding the Agency's approach to locating MKULTRA test subjects; (3) a memo from the DDA to the DCI describing advice that the OGC gave the DCI regarding the scope of the task force investigation; (4) a memo to the DDA from a Special Assistant concerning questions that need to be answered regarding a program for notification of drug testing and summarizing advice given to the DDA by the GC about legal factors to be considered in contacting persons associated with MKULTRA; (5) a memo to the DDA from the Special Assistant to the DDA concerning notification of drug test subjects and describing legal information provided to the Special Assistant by the GC; (6) a memo marked "Confidential" to the GC from the DCI with a legal question regarding MKULTRA; (7) a memo to the GC from the DCI soliciting legal advice from the GC about a joint program with the DOJ to identify MKULTRA subjects; (8) a memo from DCI summarizing his telephone conversation with the AG and the GC, which discussed possible courses of action to be taken by the DOJ for MKULTRA notification; (9) a memo from the Agency's OGC to an Agency employee relaying confidential legal advice regarding the status of the DOJ's efforts in examining MKULTRA for the notification of individuals; (10) an inter-office note from an Agency employee to the GC containing confidential legal advice on the status of the plan to identify MKULTRA subjects; (11) a memo from an AGC to the DCI providing legal advice about the status of the MKULTRA notification program; (12) a memo from the GC to the DCI consisting of confidential legal advice about approval of a letter to the AG that summarizes the legal issues connected to the notification program; (13) a confidential memo from the GC to the DCI regarding the undertaking of a program on identifying MKULTRA subjects; (14) a letter to the Office of Legal Counsel, DOJ, from the AGC containing a confidential legal communication about the results of

37

testing on witting individuals; (15) a memo to the DCI from the GC containing a confidential

relay of legal advice about a response to a congressional inquiry regarding efforts to notify

MKULTRA individuals; (16) a note for the GC from an Agency employee concerning the DOJ's

opinion on the Agency's responsibilities and authority to locate individuals; (17) a routing and

record sheet with a note on it from the AGC relaying confidential legal advice on how to

organize all relevant information pertaining to identifying individuals related to MKULTRA;

(18) a memo from an AGC to an Agency employee about legal actions that should be taken by

the Agency; (19) a memo from an AGC to the Office of Technical Service containing

confidential legal advice regarding the Office's personal and official interest in the notification

program; (20) a memo from the AGC to an Agency employee containing confidential legal

advice concerning how to proceed with the notification of individuals involved in MKULTRA;

(21) a note to the DCI from the GC giving confidential legal advice about the Agency's request to

the DOJ for finalization of its opinion on the Agency's responsibility and authority to search for

MKULTRA test subjects; (22) a letter from the Agency to the AG containing confidential legal

advice and requesting a more definitive statement of the issues regarding the Agency's obligation

to MKULTRA subjects; (23) a letter to the JAG from the AGC containing confidential

communication of legal advice concerning the DOJ's opinion on the government's responsibility

to attempt to identify and notify MKULTRA test subjects; (24) a letter from the AGC to the

DOJ's Office of Legal Counsel concerning the DOJ's opinion on the government's responsibility

to attempt to identify and notify MKULTRA test subjects; (25) a memo for the DCI from the GC

containing confidential communication of legal advice concerning the DOJ's opinion on the

government's responsibility to attempt to identify and notify MKULTRA test subjects; (26) a

38

memo for the acting-DCI from the GC forwarding a proposed response to an inquiry from a

Senator regarding notification of MKULTRA subjects; (27) a memo from the OGC to an Agency

employee giving confidential legal advice that further action is required to identify subjects on

various MKULTRA projects; (28) a memo from the AGC to two Agency employees giving

confidential legal advice concerning the prioritized listing of MKULTRA subprojects; (29) a

memo from the Special Assistant to the DDA to the GC discussing confidential legal advice

about a coordinated position to be presented to the DCI on MKULTRA testing; (30) a memo

from the GC to an Agency employee communicating confidential legal advice on the non-

concurrence of the GC to another memo suggesting that no further action be taken on a

subproject; (31) a memo to the Special Assistant to the DDA from the AGC containing

confidential legal advice concerning the reconsideration of subprojects of MKULTRA; (32) a

memo from the GC to an Agency employee containing confidential legal advice about the GC's

non-concurrence in the determination that no further action was required in relation to a specific

subproject; (33) a four-page MFR by an Agency employee with concurrence by the GC,

containing confidential legal advice about MKULTRA subprojects, institutions, and request for

assistance/testimony from an individual working at the facility; (34) a letter to the GC from the

Special Assistant to the DDA containing confidential legal advice about guidelines for the

identification of activites which should be reviewed to determine the notification process; (35) a

memo from the Special Assistant to the DDA to the OGC which contains confidential legal

advice about the evaluation of drugs compiled from MKULTRA files; (36) a memo to the DDA

from the Special Assistant to the DDA relaying information provided to the Special Assistant by

the OGC regarding legal opinions on the notification program; (37) a memo from the AGC to an

Agency employee discussing a draft letter requesting assistance from a MKULTRA researcher; (38) a memo from the Special Assistant to the DDA to the GC containing confidential legal advice about redrafts of letters to private individuals regarding assistance in the notification program; (39) a memo to the GC from the Special Assistant to the DDA containing confidential legal advice about redrafts of letters to private individuals regarding assistance in the notification program; (40) a memo from an Agency employee, with concurrence by the GC, communicating confidential legal advice about the details of subprojects; (41) a memo by an Agency employee, with a concurrence by the GC, communicating confidential legal advice about the biography of an individual, subprojects, and results of the research program; (42) a memo from an AGC to an Agency employee discussing the OGC opinion regarding a certain subproject; (43) a draft letter to a researcher with an Official Routing slip from an attorney attached stating review comments on the draft; (44) a memo from the Special Assistant to the DDA to the AGC communicating confidential legal advice regarding the reconsideration of the AGC's position on certain subprojects; (45) a memo from the AGC to the Special Assistant to the DDA communicating confidential legal advice regarding the reconsideration of the AGC's position on certain subprojects.  Ex. D to Def.'s Mot.

The Court finds the Vaughn Index descriptions adequate to show that the information withheld was communicated by or to an attorney in order to provide the Agency with confidential advice on the legal ramifications of and strategies for dealing with the program to notify unwitting subjects of MKULTRA drug testing.  See Mead Data Cent., 566 F.2d at 253 (holding that the attorney-client privilege applies when the agency demonstrates that the documents in question were communicated to or by an attorney as part of a professional relationship in order to

provide legal advice on confidential matters).

Third, the CIA claims that the deliberative process privilege justifies its withholding of thirty-nine documents. Def.'s Mot. at 37.[10] The deliberative process privilege, which protects the decision-making processes of government agencies, is a recognized privilege under Exemption 5. Mapother, 3 F.3d at 1537. Two requirements must be met for the deliberative process privilege to be invoked. Coastal States, 617 F.2d at 866. First, the communication must be "predecisional," or generated before the adoption of an agency policy. Id. Second, the communication must be "deliberative," or reflective of the "give-and-take" of the consultative process. Id. The CIA claims that numerous proposals about how to approach the identification and contact of possible MKULTRA victims were considered and then either refined, rejected, or eventually adopted. McNair Decl. ¶ 43. Each proposal, the CIA claims, was thoroughly evaluated and critiqued, with alternatives suggested, and a veritable debate ensued before a final decision was made. Id. The CIA claims that the withheld information consists of these pre-decisional determinations involving Agency personnel and also discrete pre-decisional deliberations with other agencies, such as the DOJ. Id.

The CIA's Vaughn Index describes the thirty-nine documents for which the CIA invokes the deliberative process privilege as: (1) a memo from the DDA to the DCI containing candid, pre-decisional thoughts on how to approach the task of locating MKULTRA test subjects; (2) a letter to the Honorable Daniel K. Inouye from the Agency notifying the Senator that the Agency was in the process of deliberations regarding the Victims Task Force but that the Agency had not

_____

[10] The CIA invokes the deliberative process privilege for many of the same documents for which it asserts the work-product and attorney-client privileges. See Vaughn Index (Ex. D to Def.'s Mot.).

finalized those deliberations; (3) a letter to Senator Kennedy notifying him that the Agency was in the process of deliberations regarding the Victims Task Force but that the Agency had not finalized those deliberations; (4) an MFR regarding a meeting with an SSC staffer containing candid, pre-decisional information regarding the scope of the Victims Task Force as part of the Agency's process of deliberations; (5) a memo to the DDA from a Special Assistant containing candid, predecisional comments and recommendations concerning the problems associated with attempting to notify MKULTRA subjects; (6) a memo to the Director of Technical Service from the Missions Programs Staff concerning the preparation of discussions on MKULTRA; (7) a memo to the DDA from the Special Assistant to the DDA containing candid, pre-decisional comments seeking guidance before proceeding with attempting to notify MKULTRA subjects; (8) an MFR from the DCI summarizing his telephone conversation with the AG and the GC in which the DCI was seeking guidance before proceeding with attempting to notify MKULTRA subjects; (9) a memo to the DCI from the Director of Technical Service concerning whether to restrict searches for MKULTRA subjects to unwitting subjects only; (10) a memo from the OGC to an Agency employee regarding the status of DOJ's efforts in examining the notification program; (11) an inter-office note from an Agency employee to the GC requesting to be brought up-to-date on the status of the notification program before proceeding with attempting to notify the subjects; (12) memo from an AGC to the DCI containing candid, pre-decisional comments about seeking guidance from a third agency before proceeding with a notification program; (13) an MFR from the GC containing pre-decisional comments regarding a meeting with the DOJ regarding the MKULTRA notification program; (14) a memo from an Agency attorney to an Agency employee concerning research done on the Agency's authority to be involved in

42

notifying individuals or compensating the subjects of MKULTRA and containing pre-decisional thoughts on legal aspects of notifying individuals; (15) a memo to the DCI from the GC discussing a response to a congressional inquiry regarding efforts to notify MKULTRA subjects, giving pre-decisional comments about diverging legal opinions on notifying MKULTRA subjects; (16) a note for the GC from an Agency employee giving pre-decisional comments regarding the status of DOJ guidance; (17) an internal routing and record sheet, which includes notes by an Agency attorney, and a three-page MFR by an Agency attorney describing the advice given by a non-Agency investigator on what to consider when planning and executing a notification program; (18) a routing and record sheet with a note on it from an AGC containing pre-decisional comments on how best to approach file searches before proceeding with attempting to notify MKULTRA subjects; (19) a memo from an AGC to an Agency employee containing pre-decisional comments on sending letters to Congress notifying Members of the notification program; (20) a memo to the DCI from the GC making recommendations regarding sending letters to two Senators; (21) a memo from the AGC to an Agency employee containing candid, pre-decisional advice on how to proceed with the Victims Task Force; (22) a note to the DCI from the GC containing candid, pre-decisional comments regarding DOJ coordination on the notification program; (23) a letter from the Agency to the AG containing candid, pre-decisional information on legal issues that needed advice and guidance prior to proceeding with the Victims Task Force; (24) a letter to the JAG from an AGC containing pre-decisional intra-agency comments of an advisory nature regarding legal guidance for the Victims Task Force; (25) a letter to the DOJ's Office of Legal Counsel from the AGC describing pre-decisional intra-agency advice on legal issues for the Victims Task Force; (26) a memo for the DCI from the GC

43

containing pre-decisional intra-agency comments of an advisory nature regarding legal guidance

for the Victims Task Force; (27) a memo for the Acting-DCI from the GC containing pre-

decisional advice regarding communications to Congress about the notification program; (28) a

draft of an intra-agency memo for the Adminstrator, DEA, from an unidentifed source regarding

cooperation in the MKULTRA investigation; (29) a memo from the OGC to an Agency

employee containing pre-decisional inter-agency communication about furhter action to identify

subjects of testing; (30) a memo from the Special Assistant to the DDA containing pre-

decisional, intra-agency communication seeking a recommendation from the GC on a

coordinated position to be presented to the DCI about MKULTRA testing; (31) a memo from the

GC to an Agency employee containing candid thoughts of attorneys and decision-makers of the

Agency, including rejection of several conceived ideas; (32) a memo for the OGC from the

Special Assistant to the DDA containing pre-decisional recommendations on the evaluation of

drugs compiled from MKULTRA files; (33) a memo to the DDA from the Special Assistant to

the DDA reviewing the proposed standards for the program of notification; (34) a memo from the

AGC to an Agency employee discussing a draft letter requesting assistance from a MKULTRA

researcher; (35) a memo from the Special Assistant to the DDA to the GC containing pre-

decisional recommendations on the sending of letters to researchers; (36) a memo to the GC from

the Special Assistant to the DDA discussing the redrafts of letters to researchers regarding

assistance in the notification program; (37) a draft letter to a researcher with an Official Routing

slip from an attorney containing pre-decisional comments regarding communications to

researchers; (38) a memo from the Special Assistant to the DDA to the AGC containing pre-

decisional comments regarding the Agency's efforts regarding specific subprojects; (39) a memo

from the AGC to the Special Assistant to the DDA containing pre-decisional comments

regarding OGC opinions on specific subprojects.  Ex. D to Def.'s Mot.

The Court finds the Vaughn Index descriptions adequate to show that the information

withheld contains advice, recommendations, draft documents, and suggestions about the Victims

Task Force that were generated before the adoption of the Agency program that was eventually

effectuated.  See Coastal States, 617 F.2d at 866 (holding that the deliberative process exemption

covers "recommendations, draft documents, proposals, suggestions, and other subjective

documents which reflect the personal opinions of the writer rather than the policy of the

agency").

Kelly argues, however, that the CIA cannot withhold information on the basis of

Exemption 5 because the CIA's prior public disclosure of the information Kelly requests

eliminates the need for the confidentiality asserted by the CIA.  Pl.'s Cross-Mot. at 23.  For

disclosure to be compelled over an agency's otherwise valid exemption claims because the

requested information is already publicly available, three criteria must be met.  Fitzgibbon, 911

F.2d at 765.  First, the information requested must be as specific as the information previously

released.  Id.  Second, the information requested must match the information previously

disclosed, and third, the information requested must have been made public through an official

and documented disclosure.  Id.

Kelly claims that Director Stansfield Turner's 1977 Senate testimony made public the

CIA's efforts to locate MKULTRA victims and the considerations weighed by the CIA and other

parts of the government as to how to proceed with the investigation of MKULTRA—the

information the CIA now withholds from Kelly.  Id.  The Court, however, finds that Director

Turner's testimony about MKULTRA before a Senate committee in 1977 was not a prior public

disclosure of the information sought by Kelly in this case.  Director Stansfield admitted in his

testimony that the CIA was working with other branches of the government to track down the

identities of MKULTRA victims and fulfill the government's responsibility to those individuals,

and he specifically mentioned working with the Justice Department, but that is the extent of his

testimony on the specifics of the Victims Task Force.  See Turner's Test. (attached as Ex. D to

Pl.'s Cross-Mot.).  Director Turner did not mention the actual deliberations that took place or any

recommendations or suggestions that were either adopted or rejected.  See id.  Thus, the

information sought by Kelly is much more specific than the information contained in Director

Turner's testimony and does not match the information previously disclosed.

Kelly also argues that the CIA cannot withhold information on the basis of Exemption 5

because the CIA has failed to release reasonably segregable portions of withheld records as

required by FOIA.  Pl.'s Cross-Mot. at 23-24.  Kelly rests this claim on his assertion that the

CIA's prior public disclosure of information about the Victims Task Force demonstrates that

reasonably segregable factual information has not been released to him.  Id. at 24 (citing Mink,

410 U.S. at 89 (holding that deliberative or policy-making processes are exempt under the

deliberative process privilege but that factual, investigative material is not exempt)).  The Court

has determined, however, that there has not been a prior public disclosure of the information

withheld on the basis of Exemption 5, and Kelly has not pointed to specific descriptions in the

Vaughn Index to show that any of the withheld documents contain segregable factual

information.  The CIA, on the other hand, affirmatively asserts in its Vaughn Index descriptions

for all documents withheld in full that no information could be released without violating the

46

attorney work-product privilege, the attorney-client privilege, or the deliberative process privilege.  See Ex. D to Def.'s Mot.  Therefore, because Kelly has not supported his claim with evidence in the record, but merely rests his claim that segregable information has not been released on a prior, meritless claim, and because the claim is contrary to the government's affidavits, which are to be accorded substantial weight, the Court upholds the CIA's claim that no reasonably segregable portions of withheld documents could be released.  See Military Audit Project, 656 F.2d at 745 (upholding the government's Exemption 5 claim because "the key premise on which the appellants base their argument . . . is unsupported by the record and contrary to the government's affidavits, [which] are entitled to substantial weight."); see also Mink, 410 U.S. at 839 (holding that if a court finds that an agency's affidavits are detailed enough to establish that the requested document falls within Exemption 5's deliberative process privilege, the court may rely on the affidavits and find the agency's withholding justified).

Thus, the Court affirms the CIA's withholding of four documents in part and sixty-three documents in full on the basis of FOIA Exemption 5.

### 4. Exemption 6

The CIA invokes Exemption 6 to withhold identifying information about CIA researchers, potential and actual unwitting test subjects and their families, law enforcement agents who were involved in the test projects or in later efforts to identify test subjects, and CIA personnel.  Def.'s Mot. at 39.  The Court has already ruled that the CIA may withhold the names of MKULTRA researchers and Agency employees on the basis of Exemption 3.  See supra Part II.D.2.  The Court therefore will only address the CIA's withholding of the names of test subjects and their families and the names of law enforcement agents involved in MKULTRA or the

47

Victims Task Force.

Exemption 6 permits the government to withhold all information about individuals in "personnel and medical files and similar files" when the disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). The Supreme Court has made it clear that the threshold test for Exemption 6 coverage is met by information that "applies to a particular individual." Dep't of State v. Washington Post Co., 456 U.S. 595, 602 (1982). Once it has been established that information meets the threshold requirement of Exemption 6, the inquiry turns to whether disclosure of the information at issue "would constitute a clearly unwarranted invasion of personal privacy." This requires a balancing of the public's right to disclosure against the individual's right to privacy. Dep't of the Air Force v. Rose, 452 U.S. 352, 372 (1976).

The CIA claims that many individuals associated with MKULTRA have repeatedly informed the CIA that they wish to have their identities protected. McNair Decl. ¶ 33. The CIA claims that Drug Enforcement Agency ("DEA") agents expressly requested that the Agency withhold all information that could identify DEA personnel involved in the project because of the negative stigma attached to the project. Id. n.5. According to the CIA, some of the DEA personnel who were involved in MKULTRA are still working for the DEA and release of their names in association with the project would negatively impact the perception that both the public and their peers have of them. Id. ¶ 33. The CIA also claims that many of the unwitting subjects were horrified to learn that they had been unknowingly connected to this program or the CIA and refused to meet with the Agency. Id. Others who did agree to talk to the Agency agreed to do so only on the condition that the Agency protect their identities or the identities of their relatives.

Id. Moreover, the CIA claims, if the names of people involved in MKULTRA were released, these people would be at risk of being harassed for details concerning MKULTRA and they should not have to bear the intrusion that would result from public announcement of their MKULTRA association. Id. Therefore, the CIA claims that there are significant privacy interests to be protected with regard to the identities of subjects and law enforcement agents involved in MKULTRA.

Kelly claims, however, that the privacy interests are outweighed by the public's interest in disclosure. Pl.'s Cross-Mot. at 24. The Supreme Court has limited the concept of public interest under the FOIA to the core purpose for which Congress enacted it: "to shed[] light on an agency's performance of its statutory duties." Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 773 (1989). Information that does not directly reveal the operations or activities of the federal government "falls outside the ambit of the public interest that the FOIA was enacted to serve." Id. at 775. The public interest in MKULTRA is certainly very high, as evidenced by the numerous government investigations into the program, and as FOIA makes clear, citizens certainly have a right to "know what their government is up to," id. at 773, which includes having a right to certain information about a government plan to carry out drug tests on our own unwitting citizens. However, Kelly has not demonstrated that knowing the names of unwitting test subjects would shed any light on the MKULTRA program or the CIA's activities. See id. ("[FOIA's] purpose . . . is not fostered by disclosure of information about private citizens that is accumulated in various governmental files but that reveals little or nothing about an agency's own conduct."). The only purpose disclosure of the names of victims would accomplish is that it would make it likely that Kelly, or any other interested party, would track down those

49

individuals or their relatives to obtain their version of events, but it would not reveal details about the nature of the program or the CIA's involvement.  Moreover, Kelly does not demonstrate that the disclosure of the names of law enforcement officials involved in MKULTRA would reveal details about the nature of the program or the CIA's involvement, and the Court does not understand how disclosure of those names would shed any light on the CIA's activities with regard to MKULTRA.  See Beck v. Dep't of Justice, 997 F.2d 1489, 1493 (D.C. Cir. 1993) ("The identity of one or two individual relatively low-level government wrongdoers, released in isolation, does not provide information about the agency's own conduct.").

Thus, because the privacy interests of the test subjects and law enforcement officials involved in MKULTRA are significant in light of the stigma and embarrassment over being associated with the project, because of the likelihood that the individuals would be harassed for additional details concerning the program, see Dep't of State v. Ray, 502 U.S. 164, 177 (holding that the likelihood that respondents planned to make direct contact with the individuals whose names were requested magnified the importance of the individual's privacy interests), and because the release of the names would not further the public interest by shedding any additional light on the CIA's activities in the MKULTRA program, the Court affirms the CIA's invocation of Exemption 6 to withhold the names of test subjects and law enforcement agents associated with MKULTRA.[11]

---

[11] Even though many of the individuals involved in MKULTRA have likely passed away (since the program took place over forty years ago) and courts often hold that death diminishes a person's privacy interest, "that privacy interest continues to be paramount, unless the requester demonstrates the existence of a public interest in disclosure." Blanton v. Dep't of Justice, 63 F. Supp. 2d 35, 46 (D.D.C. 1999). The Court will not order the CIA to release the names of deceased individuals involved with MKULTRA because Kelly has not demonstrated a public interest in disclosure of those names.

*5. Executive Order 12,333*

Kelly's final argument as to why the CIA must release withheld information about the Victims Task Force is that Executive Order 12,333, part 2.10 prohibits any agency in the intelligence community from sponsoring, contracting, or conducting research on human subjects without their informed consent. Pl.'s Cross-Mot. at 26.   Thus, Kelly argues, because Executive Order 12,958 forbids the classification of records in order to conceal violations of law, the CIA must release all records that relate to CIA sponsored drug testing on non-consenting human subjects. Id.  However, the Court finds this argument misplaced as no records at issue in Count Two are classified under Executive Order 12,958. See Vaughn Index (attached as Ex. D to Def.'s Mot.).

## III. CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part the CIA's motion for summary judgment and Kelly's cross-motion for summary judgment.  The Court specifically will grant summary judgment for the CIA and permit its withholding of all documents at issue in Count One and all documents at issue in Count Two, except that the Court will order the CIA to search and review its operational files for information concerning the MKULTRA project and to make all releasable information available to Kelly.  The Court accordingly will deny Kelly's cross-motion for summary judgment in all respects except with regard to the operational files concerning MKULTRA.  An appropriate order will accompany this Memorandum Opinion.

August __8__, 2002

Thomas F. Hogan
Chief Judge

51